CHARLES F. SIDWELL, Administrator of the Estate of John J. Doty, v. ECONOMY COAL COMPANY, Appellant.

**Master and servant:** NEGLIGENCE: FAILURE TO WARN: EVIDENCE. One employed in a coal mine to assist in cleaning the air courses or passages for the purpose of ventilating the entries and chambers of the mine, is presumed to be familiar with the law of gravitation, and to know that loose material in the roof, if it fell, would fall toward the floor of the mine; and where he was as fully aware of the danger as he would have been had the

superintendent of the mine warned him of such danger, failure to give a warning was not the proximate cause of the injury thus received. Evidence held to show that plaintiff, long before the accident, was as fully advised of the danger as he would have been had defendant's superintendent warned him thereof.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

WEDNESDAY, MARCH 13, 1912.

ACTION to recover damages for the death of John J. Doty, who is alleged to have lost his life because of the negligence of defendant. Trial to a jury. Verdict and judgment for plaintiff, and defendant appeals.—*Reversed.*

*Guernsey, Parker & Miller, C. Woodbridge* and *Hewitt, Miller & Wallingford,* for appellant.

*E. A. Lingenfelter,* for appellee.

PER CURIAM.—The defendant operates a coal mine in Polk county, Iowa. On October 20, 1907, John J. Doty, being employed by defendant for that purpose, was directed to assist in cleaning out the air course or passage constructed for the ventilation of the entries and chambers of the mine in which the work of digging and removing the coal was carried on. This air course had become obstructed to some extent by falls of rock from the roof and by the upheavel or lifting of the floor or bulging of the sides, due to the great pressure upon the pillars or walls, constituting what is known in miner's parlance as a "squeeze." Doty was one of the gang of four men employed in remedying this condition, and while so employed he was crushed and fatally injured by a fall of rock from the roof. It is the claim of plaintiff, who sues as administrator of Doty's es-

tate, that the deceased was without experience in this line of work and did not know or appreciate its dangerous character, and that defendant negligently ordered him to take part therein without warning or instruction as to its perils, or of the precautions necessary to be observed in avoiding them, and that by reason of such negligence the deceased came to his death without contributory fault on his part.

The defendant denies that it was in any manner negligent, and avers that the negligence of the deceased himself was the proximate cause of the accident. It further pleads that said Doty well knew, or under all the circumstances should have known, the condition and danger of the place in which he worked and the perils to which he was there exposed, and that with such knowledge and means of knowledge he elected to remain in said employment, and thereby assumed the risk and waived all right of recovery against the defendant for injuries he might there sustain. Further answering the defendant says that the air course was not intended or used as a place of work, except as certain employees might from time to time be called upon to clean it and keep it in repair; that at the time of the accident said air course had become obstructed by falls from above and by squeezing up from below, and in removing this condition it was necessary for deceased and his fellow workmen to observe and inspect the roof and sides of the air course and to prop and support the roof, or to remove the loosened fragments of rock, whenever such precautions were necessary to protect themselves from injury, and that the observance of this rule was then the custom of this and other mines in that vicinity. Wherefore it is averred that no duty rested upon the defendant to inspect the roof of the air course or to warn deceased or his fellow workmen of the dangers thus arising in the progress of the work; but that said employees assumed the duty and the risk of

making the necessary inspection and applying the necessary remedies or safeguards to protect themselves from injury.

Upon the issues thus joined, there was trial to a jury, and verdict and judgment for damages assessed at $1,500.

The testimony on the part of the plaintiff tends to show that John J. Doty was twenty-six years old at the time of his death. His usual occupation was formerly that of a teamster, but for the five years last preceding 1907 he had been employed as lineman for a telephone company. Prior to that time he had worked a little while in or about a coal mine in Boone, but the nature and extent of his experience there is not shown. On October 15, 1907, he with three others was taken into the employment of defendant for the work of opening up or cleaning out the air course. Doty with Brooks, a young man seventeen years of age, started in at the south end of the course, and worked north to meet the other two men working from the opposite end. The method pursued was to remove the obstructing material by loading it into a car moved on rails extended upon the floor of the air course as the way was cleared, and in this manner to carry it back to a convenient place of deposit. The younger man, Brooks, appears to have had considerable experience in coal mining and to have taken the lead in the work. Among other things, as they made their way into the air passage, they occasionally took down loose overhanging rock, and in other places erected props and bars to guard against falls. On the morning of the fifth day at this labor, Brooks pointed out a place where he suggested the wisdom of erecting a prop, and Doty responded, "Do you think it needs it?" Brooks replied in the affirmative, and said that when he went out to the entry with that carload he would bring in a prop. Thereupon Doty began clearing a place to set the prop, when the mass of rock fell upon him. As a witness, Brooks says that the deceased by his awkwardness or manner of work indicated his unfamiliarity with such employ-

ment. He also says, in substance, that when the boss or foreman took them to the air course and pointed out the work to be done he gave them no instructions or warning as to the dangers attending such employment. In this respect he is disputed by the boss, who says the four men were new to this mine, and he had no prior acquaintance with any of them. He further says, "I asked these men if they could put up props and keep themselves safe. They said they could. Doty said he could. . . . I was in their room every day. I saw it was dangerous. I told them to take down loose pieces of slate, or prop it up and make themselves safe." This version of the circumstances is denied by Brooks, and in part he is corroborated by another miner who claims to have been present. This witness further testifies that Doty told the boss he didn't know whether he could set props or not, and says in effect that Brooks was paired with Doty in the work because he (Brooks) was a miner.

In submitting the issues the court instructed the jury that, under the case as made by the pleadings and evidence, the defendant could not be charged with negligence because of the dangerous condition of the air course, and that it was the duty of the workmen therein to inspect the roof and protect themselves against danger from falling rock, and therefore plaintiff could not recover damages in this action, unless it be found that Doty was an inexperienced man without knowledge of the dangers incident to such employment, and that knowing this fact defendant employed him and set him to work without instruction or warning concerning its perils and the manner of avoiding them. In such case the jury were told that if Doty, being without the requisite experience or knowledge and having no appreciation of the risks to which he was subjected, was injured because of the lack of proper instruction or warning by his employer, and that he did not contribute to the injury by his own want of reasonable care, then the de-

fendant was liable. They were also further instructed that such recovery could not be sustained, if the deceased at the time of his injury knew, or in the exercise of reasonable care on his part ought to have known, of the danger.

The contentions of appellant are: (1) That the defendant was not guilty of negligence in the respect mentioned; (2) that the deceased was guilty of contributory negligence; and (3) that, even though the defendant was negligent in failing to instruct the deceased and warn him of the dangers incident to the work he was about to undertake, yet he became fully informed with respect to the conditions and dangers incident to the work prior to the occurrence causing his death; and therefore any omission of duty owing him on the part of defendant was not the proximate cause of his death.

Conceding that the evidence was such that the jury might have found the decedent inexperienced in the work he was about to undertake, and that the defendant's superintendent was aware of this and omitted to warn or instruct him concerning the dangers thereof, as the jury might have found, yet it conclusively appears from the record that, notwithstanding this, he became as fully aware of the dangers incident to his employment, and how to avoid them, before the fatal accident as he could have from anything the superintendent might have said to him; and therefore, though the defendant may have been derelict in not directing his attention to the peculiar dangers involved in undertaking to clean out the air course, this could not have been the proximate cause of his injury. Of course, there is no negligence in not instructing a person as to that which he already knows, and if, before suffering because of ignorance, he ascertain all the information which should have been imparted to him, he is thereafter charged with knowledge thereof, and can not complain because of conditions he has become aware of, or of not being instructed concerning dangers of which he had become as

fully informed as his employer. This seems too evident to require the citation of authority, but see *Olesen v. Coal Co.*, 115 Iowa, 74; *Williams v. Coal Co.*, 146 Iowa, 489.

The deceased is presumed, in the absence of any showing to the contrary, to have been familiar with the law of gravitation, and to have known that any material which was loose or might become so in the roof of the air course would fall toward the earth. *Michaelson v. Sergeant Bluffs & Sioux City Brick Co.*, 94 Iowa, 725.

Reverting to the evidence, it appears that decedent began work Tuesday, October 15, 1907, and was killed on the following Sunday, about 10 o'clock a. m. He had been engaged in cleaning out the air course in the meantime, and, according to the evidence, had learned by actual experience and observation the very dangers it is said he should have been warned against.

One Young, who was timberman in the mine, explained its underground construction by saying:

There is one main entry and one main air course; the other air courses ran off from the main air course. They are made for the purpose of carrying the air. They run parallel with the entries. The ninth air course ran parallel with what is called the 'tenth entry.' The breakthroughs ran from the main air course to the other air courses. They were made for the purpose of permitting air to go up the air course and turn across and go down through the entries. In other words, the air passes up through the air course and comes back through the entry. The air shaft is located about one hundred feet north of the main shaft. The air shaft is a shaft from the surface of the ground clear down to the bottom of the coal. On the top of the air shaft, there is a fan, with steam power that drives the air down that shaft to the main air course, driving it up the main air course east, and then north on the air course No. 9, until it reached the breakthrough that it was to go through. Then the air passes through the break-through and back down the entry and out at the hoisting shaft.

He testified further:

My business in the mine was to look after the traveled ways—the entries in which the men and mules traveled. They did not travel in the air course. . . . I have nothing to do with the air course. . . . The men who worked in those air courses for the purpose of fixing them used their judgment as to how they should fix it. . . . There was no track in the ninth air course. I never saw any in there. . . . Doty went in this air course from the south end. . . . He entered from the south of the air course, passing through the break-through and into the air course.

Brooks, who worked with Doty during the time he was engaged in cleaning out the air course, testified that he first met him at the bottom of the shaft; that the mine superintendent showed them the south entrance to the ninth air course, and directed them to clean it out about four feet high and four feet wide for sixteen feet of air; that after receiving proper tools they entered the air course. He proceeded:

*You had to climb over slate and go through water. Some places this air course was three feet high, other places eight or nine feet high; but you had to crawl up over slate to get over it.* At the south end, where we commenced, it was five and one-half or six feet, and was five or six feet wide. The floor was heaved up, and the slate had fallen all over it. You could not tell very much about it until you got it cleaned up. As we went in there, we laid a track. We worked ahead until we got room enough to put a pair of rails down, and put a pair of rails down. We put the rails on top of the ties. We had to pack the material in. We dragged it up there. . . . *We went to work Tuesday morning. We worked side by side, right together. We both worked up to the face all the time. Sometimes we were right together, and sometimes about three feet apart. We were close together all the time.*

They placed a small car on the track and carried the debris away in the car.

*This was an old air course there that was partially filled up. It was not constructed with a track, or for men to go in and out.* There had at some time been a track there; but there evidently had been none in there for some time. *It was simply used for passage of air to ventilate the mine.*

*As we went forward with the work, we made ourselves safe. Whenever we found a place that we thought needed a prop, we set it. Sometimes I would set the prop alone, and sometimes Doty would help me. When· we found places we could not well set a prop, and that seemed loose, we pulled them down, or knocked them down, and hauled them away. When the roof is loose, it sounds like a drum. Sounds hollow like. You take a pick and hit it, and if it is loose it sounds like a· drum. You reach your pick ahead of you, or overhead, and tap it. If we think it is pretty loose, we would reach our pick ahead of us, and if it sounded loose we would take it down, or prop it up, or do whatever was necessary to protect ourselves. That is the way Doty and I worked for five days.*

It is substantially the same way like a miner would work in his room. When you go into a room, after you have fired a shot, you test the roof, *and, if you found a loose place or a hollow place, you do not go under it until you prop it up or take it down.* That is the way we do in working in mines, the way we did—the same way. *If we thought it was not safe, we* knocked it down, or pulled it down, or got some props under it, so that we thought it would not fall on us. We got props from out on the eighth entry, or at the parting, for the work. If we ran short of props, we would ask for them, and they would send them down. . . . When we thought the roof was safe enough that it would not fall down, we did not take it down, but propped it up. Mr. Doty was working there with me. There was not any one else there. . . . I looked out for my own safety. I don't know whether Doty did for his or not. Sometimes he would be there alone. That would happen when one of us was going back and getting a drink, or something. It would only be temporary. During the eight hours of work, *Doty and I would be working there together.* Sometimes he would be working ahead of me,· and I would be shoveling

back, and sometimes I would be working ahead of him, and he would be shoveling back. *I was doing my part, and he was doing his.* Sometimes Doty held the prop up until I could get the cap piece to put over it. Sometimes he would dig the footing for it. Sometimes I would do that. Occasionally I would hold the prop up until he could get a cap piece. It was as it happened, as we were doing the work. If I was a little more handy, I would do it; and, if he was a little more handy, he would do it. *We worked as two men ordinarily do working together; each doing what came handy to do. In so far as the roof needed taking down or propping or protecting, we looked after it for our own safety. In propping the roof to make it safe, we were doing it for his benefit as much as my own; and what he did he was doing for my safety as much as his own. I felt he had the same responsibility that I had.* When we were working there, we would be maybe ten feet apart sometimes, and the other times we would only be three feet apart. When we were setting up props one of us would hold it and the other drive the cap in.

The second day we did not get as much track laid as we did the first. There was more dirt to clean up that day. *As we were working there, once in a while a little piece of the roof would fall down. We knew that if we did not look after the roof it was likely to fall any place. We could tell that by observation in there, the general condition, and by sounding and the way the appearance of things were.* The day Doty was hurt, about four or five tons of slate fell. Doty and I were in there at the time. I took the car back to unload it, and I called him out from there, and we sat down there, and Mr. Reynolds came in. It was popping and breaking the props down, and a piece nearly fell on Mr. Reynolds. Then we cleaned up that slate that had fallen. When slate fell down from the roof, if it fell in the way, or where we wanted our car to run, we would have to pick it up and haul it out, if the opening was not large enough. When we thought we could prop it up safely, we generally tried to prop it up, instead of taking it down. Our directions were to leave a space four feet wide and four feet high. But it did not make any difference if it was six feet, as long as there was sixteen feet of air going through. What we had

to do was to leave an air space of sixteen square feet at all places. We took this dirt and slate back and unloaded it. First we would load it on the car, and then take it back and unload it at the place from which we started. Mr. Reynolds told us where to put it, and we unloaded it at that place. There was room there which was not needed for anything in which we dumped some of this stuff. We took turns loading this stuff on the car. Sometimes we both pushed the car back, and sometimes both of us unloaded it. We divided up the work. We worked together. Whenever the work could be done more conveniently by one assisting the other, we did it that way.

It was about 10 o'clock in the morning when Doty was hurt. We had not laid any track that morning. I was right in front of the car at the time the slate fell, about two and one-half or three feet from Doty. I was between him and the car. I was loading in the car. At the time the slate fell, Doty was scraping away or digging a little space for props. *Just before the slate fell, he was talking there, and I says, 'Buddy, we better dig a place along that side and put a prop in before it falls down,' and he says 'All right,' and I was just going back to see if I could get a prop. We could tell it needed a prop, because it looked bad. It had the appearance of being a loose piece of slate. He commenced to dig this space to put the prop about ten minutes before it fell. He was throwing the dirt back, and I was loading it on the car. At the time the slate fell, he was on his knees and bent over to the right side. Was on the east side of the entry. Before the slate fell, I looked at it and says: 'We better take that out in there and get a prop under there. That looks kind of bad'—or something like that, to the best of my knowledge; and he says, 'Do you think it needs it?' and I says, 'Yes,' and I says, 'When I go back with this car, I will fetch one in,' and he had to clean quite a bit up there before I could get a prop in. And when I said that he says, 'Do you think it needs it?' and I said I thought it did. He did not say anything in response to that, but started to whistle, and I started to loading the car. He started digging then. In a little while after that, the slate fell.* I don't remember whether there was any further conversation between what I have said and the

time the slate fell. I was 'between him and the car at the time the slate fell. . . . *There was one big fall back of where we had cleaned.* I should judge there were four or five tons fell there. Took it about fifteen minutes to fall. I could hear it getting ready. *It cracked and broke the props under it. We got back out the way. It fell on our track; then we hauled it back and dumped it in the gob.*

Other evidence disclosed that the air course is not used, save in the transmission of air to the entries and miners' rooms, and that customarily workmen in cleaning an air course looked out for their own safety in the matter of inspecting the roof, and in either propping or removing loose material therefrom. The evidence set out conclusively shows that, long before the slate fell which caused Doty's death, he was as fully aware of the dangers of material falling from the roof of the air course, and of the necessity of ocular and other inspection of the roof, as well as he possibly could have been from anything the superintendent of the mine could have said to him. This being so, the failure to warn and instruct could not well have been the proximate cause of his death. For this reason, the court erred in submitting this issue to the jury. —*Reversed.*